Larry BROWN, individually and on behalf of all others similarly situated, Plaintiff,

v.

CHINA INTEGRATED ENERGY, INC., Gao Xincheng, Albert C. Pu, and Li Gaihong, Defendants.

Case No. CV 11–2559 MMM (PLAx).

United States District Court, C.D. California.

July 12, 2012.

Mark John Geragos, Geragos & Geragos, Jeff S. Westerman, Milberg LLP,

Laurence M. Rosen, Rosen Law Firm, Lionel Zevi Glancy, Michael M. Goldberg, Peter A. Binkow, Glancy Binkow and Goldberg LLP, Justin B. Farar, Kaplan Fox and Kilsheimer LLP, Los Angeles, CA, Ian D. Berg, Abraham Fruchter & Twersky LLP, San Diego, CA, Thomas C. Bright, Gold Bennett Cera & Sidener, Laurence D. King, Linda M. Fong, Kaplan Fox & Kilsheimer LLP, San Francisco, CA, for Plaintiffs.

Amanda J. Sherman, Loeb and Loeb LLP, Century City, CA, Eugene R. Licker, John Piskora, Loeb and Loeb LLP, New York, NY, Walter Allan Edmiston, Loeb and Loeb LLP, Los Angeles, CA, for Defendants.

## ORDER DENYING MOTION TO DISMISS

MARGARET M. MORROW, District Judge.

This is a putative securities fraud class action under the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). On August 21, 2011, the court consolidated a number of actions filed by plaintiffs seeking to represent individuals who purchased the common stock of China Integrated Energy.[1] On December 20, 2011, lead plaintiff Puerto Rico Teachers Retirement System ("Puerto Rico TRS") and plaintiff Bristol Investment Fund, Ltd. (collectively "plaintiffs") filed a consolidated class action complaint against defendants China Integrated Energy, various officers and directors of the company, and accounting firm Sherb & Co.[2] On February 22, 2012, defendant China Integrated Energy moved to dismiss the consolidated class action complaint.[3] Plaintiffs have opposed the motion.[4]

## I. BACKGROUND

### A. Plaintiffs' Complaint

Plaintiffs seek to represent a class of individuals who purchased or otherwise acquired the common stock of China Integrated Energy ("China Integrated") be-

---

1. Order Granting Motion of Puerto Rico Teachers Retirement System for Consolidation of Related Cases and For Appointment as Lead Plaintiff and Lead Counsel ("Consolidation Order"), Docket No. 43 (Aug. 29, 2011).

2. Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"), Docket No. 59 (Dec. 20, 2011).

3. Defendant China Integrated Energy, Inc.'s Motion to Dismiss The Consolidated Class Action Complaint ("MTD"), Docket No. 74 (February 22, 2012); see also Reply Memorandum of Point sand Authorities in Further Support of Defendant China Integrated Energy, Inc.'s Motion to Dismiss the Consolidated Class Action Complaint ("MTD Reply"), Docket No. 102 (May 9, 2012). This is the second motion filed challenging plaintiffs' consolidated complaint. On January 12, 2012, Sherb moved to dismiss plaintiffs' third cause of action—the only cause of action asserted against it. (Motion to Dismiss Consolidated Class Action Complaint for Failure to State a Claim Upon Which Relief Can be Granted ("Sherb MTD"), Docket No. 63 (Jan. 12, 2012)). Prior to moving to dismiss, China Integrated Energy filed a motion to stay discovery in a number of related actions pending in the Delaware Court of Chancery. (Defendant China Integrated Energy, Inc.'s Motion to Stay Discovery in State Court Actions ("Motion to Stay"), Docket No. 69 (January 25, 2012)). The court denied both Sherb's motion to dismiss and China Integrated's motion to stay on April 2, 2012. (Order Denying Motion to Dismiss and Motion to Stay ("MTD Denial"), Docket No. 97, 2012 WL 1129909 (April 2, 2012)).

4. Plaintiffs' Memorandum in Opposition to Defendant China Integrated Energy, Inc.'s Motion to Dismiss the Consolidated Class Action Complaint ("MTD Opposition"), Docket No. 98 (April 6, 2012).

tween March 31, 2010 and April 21, 2011.[5] China Integrated is an energy company that sells finished oil products, heavy oil products, and biodiesel fuel. It also operates retail gas stations.[6]

Plaintiffs allege that the class period began on March 31, 2010, when China Integrated reported its 2009 financial results.[7] They assert that the report released that day was materially false and misleading, and overstated the company's 2009 revenue and net income.[8] The complaint asserts that defendants created and maintained two sets of financial statements: (1) a presumably accurate set of financial records filed with China's State Administration for Industry and Commerce ("SAIC") and (2) false and misleading statements filed with the Securities and Exchange Commission ("SEC").[9] They contend that the SEC filings vastly overstated China Integrated's sales revenue, income from operations, and net income.[10]

On March 16, 2011, analyst firm Sinclair Upton published a report concerning China Integrated, in which it alleged that the company had reported significantly lower revenues, fixed assets, and net income for 2009 and 2010 in the documents it had filed with Chinese regulators than it had in reports filed with the SEC.[11] Sinclair Upton asserted that the company had been funneling money to corporations owned by the son of defendant Xincheng Gao, the company's chief executive officer.[12] The Sinclair Upton report allegedly caused an immediate 16% drop in the price of China Integrated's shares.[13] Stock prices purportedly fell another 24.6% on March 17, 2011, when analysts at Roth Capital Partners confirmed the inconsistencies reported by Sinclair Upton.[14] Although China Integrated issued a letter to shareholders on March 23, 2011, attempting to rebut the charges of financial improprieties, additional damaging information was purportedly revealed on March 28, 2011, when analyst firm Alfred Little issued a detailed report calling China Integrated a "complete hoax."[15] Alfred Little allegedly relied on a lengthy investigation of the company's Tongchuan and Chongqing Tianrun biodiesel factories, which revealed that there was no meaningful production activity at either facility.[16] The investigation purportedly contradicted assertions made by China Integrated that biodiesel production accounted for a significant portion of its total reported sales, and that the Tongchuan facility was operating at full capacity.[17]

Allegedly in the wake of these revelations, China Integrated announced that it

---

5. Complaint, ¶ 1.

6. *Id.,* ¶ 2.

7. *Id.,* ¶ 52.

8. *Id.,* ¶ 55.

9. *Id.,* ¶ 4. Plaintiffs allege that the financial reports filed with Chinese regulators were "presumably accurate" because Chinese regulators have the ability to impose fines and serious criminal penalties if reported financial results are false. In contrast, they assert, the SEC "essentially has no ability to enforce U.S. law over defendants who are insulated and 'safe' in China."

10. *Id.,* ¶ 59.

11. *Id.,* ¶ 10.

12. *Id.,* ¶ 10.

13. *Id.,* ¶ 11.

14. *Id.*

15. *Id.,* ¶¶ 12–14.

16. *Id.,* ¶ 14.

17. *Id.,* ¶¶ 69, 72–74, 78–80.

had retained the law firms of Pillsbury Winthrop Shaw Pittman, LLP and King & Wood, as well as accounting firm Deloitte Financial Advisory Services LPP, to advise its audit committee in connection with an internal investigation of the allegations made by Sinclair Upton and Alfred Little.[18] Plaintiffs assert that only a few weeks after this announcement, however, China Integrated reported that the chairman of its audit committee had resigned due to management's unwillingness to cooperate with the investigation, that another member of the audit committee had resigned, and that the chief financial officer and the two law firms hired to assist with the investigation had also resigned.[19] The company's independent auditor—KPMG—later resigned as well.[20] KPMG's resignation letter stated that no one should rely on its audit report or internal controls opinion filed with China Integrated's 2010 Form 10–K due to "inconsistenc[ies] between management's representation" that it would fully cooperate with the investigation and management's conduct during the investigation. KPMG also stated that "management's conduct during the investigation" raised doubts concerning management's representations to KPMG in connection with the 2010 audit and evaluation of internal controls.[21]

On April 20, 2011, NASDAQ halted trading in China Integrated stock after the close of trading until China Integrated could "satisfy" NASDAQ's request for additional information. The stock closed that day at $1.84 per share. Plaintiffs' class period ends the following day, on April 21, 2011.[22] They assert that NAS-DAQ delisted China Integrated on November 21, 2011; as justification for this decision, NASDAQ noted "the Company's obstruction of the board's independent investigation into recent allegations made by various individuals." [23]

Plaintiffs assert claims for violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 as well as violation of § 11 of the Securities Act of 1933.[24]

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995). The court need not, however, accept as true conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

---

18. *Id.,* ¶ 15.

19. *Id.,* ¶ 16.

20. *Id.,* ¶ 17.

21. *Id.*

22. *Id.,* ¶ 18.

23. *Id.,* ¶ 19.

24. *Id.,* ¶¶ 176–184, 199–209.

action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ).

### 1. Legal Standard Governing Plaintiffs' Section 11 Claim

Section 11 of the Securities Act provides a private right of action for purchasers of a security if the issuer publishes a registration statement in connection with the security that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To prevail on a section 11 claim, a plaintiff must prove "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1027 (9th Cir.2005) (internal quotation marks omitted); see also *Rubke v. Capitol Bancorp Ltd,* 551 F.3d 1156, 1161 (9th Cir.2009).

Not all Section 11 claims are subject to the heightened pleading requirements of Rule 9(b). *Rubke,* 551 F.3d at 1161; *In re CBT Group PLC Securities Litigation,* No. C–98–21014–RMW, 2000 WL 33339615, *3–4 (N.D.Cal. Dec. 29, 2000). "Rule 9(b) applies when (1) a complaint specifically alleges fraud as an essential element of a claim, (2) when the claim 'sounds in fraud' by alleging that the defendant engaged in fraudulent conduct . . . and (3) to any allegations of fraudulent conduct, even when none of the claims in the complaint 'sound[s] in fraud.'" *F.T.C. v. Lights of America, Inc.,* 760 F.Supp.2d 848, 852 (C.D.Cal.2010) (quoting *Davis v. Chase Bank U.S.A., N.A.,* 650 F.Supp.2d 1073, 1089–90 (C.D.Cal.2009)). A claim "sounds in fraud" when the plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1103 (9th Cir.2003). If Rule 9(b) applies to plaintiffs' section 11 claim, that claim would have to "state with particularity the circumstances constituting fraud. . . ." FED. R.CIV.PROC. 9(b). In other words, a complaint falling within the ambit of Rule 9 must "set forth what is false or misleading about a statement, and why it is false." *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir.1999) (quoting *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir. 1994)).

China Integrated argues that plaintiffs' Section 11 claims sound in fraud.[25] The complaint makes clear that plaintiffs allege a unified course of fraudulent conduct by China Integrated. *Vess,* 317 F.3d at 1103. Indeed, it asserts at several points that the company engaged in a "fraudulent scheme."[26] It states that China Integrat-

---

**25.** MTD at 15–16.

**26.** Complaint, ¶¶ 9, 17, 122.

ed's purported biodiesel production was "a complete hoax" created in part by staging "phony production activity" at the company's biodiesel factory.[27] It also alleges that "the company's revenues were a mere fabrication,"[28] and that its false revenue figures were reported to the SEC, and incorporated by reference in registration statements, rendering them false.[29]

Plaintiffs counter that the complaint pleads both fraud and non-fraud claims, and that "the heightened pleading requirements of Rule 9(b) apply only to the fraud claims, not to the non-fraud claims."[30] While this is an accurate statement of the law, see *Daou*, 411 F.3d at 1027, plaintiffs fail to identify any factual allegations pleading negligent or innocent conduct, and the court can identify none. Plaintiffs assert in their section 11 claim that they incorporate the factual allegations of the complaint "only to the extent . . . that [they] do not allege fraud, scienter, or . . . intent . . . to defraud," and that they "assert only strict liability and negligence claims and expressly disclaim[ ] any claim of fraud or intentional misconduct."[31] Having reviewed the allegations that precede plaintiffs' section 11 claim, the court can find none that suggest defendants acted innocently or negligently.[32] If plaintiffs' disclaimer were accepted as true, the court would have difficulty discerning the factual allegations on which the section 11 claim is based, and the claim would fail under *Iqbal* and *Twombly*. If

the court assumes that plaintiffs rely on factual allegations concerning misstatements in the 2009 10–K financial statements, which were incorporated in the registration statement,[33] then they plead a unified course of fraudulent conduct as the basis for the claim, and it is subject to Rule 9(b). *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1405 n. 2 (9th Cir.1996) ("[Plaintiff] argues that it specifically disclaimed any allegations of fraud with respect to its Section 11 claims. These nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus"); *Katz v. China Century Dragon Media, Inc.*, 2011 WL 6047093, *2–3 (C.D.Cal. Nov. 30, 2011) ("A complaint's disclaimer that its claims do not sound in fraud does not affect the requirement to plead in accordance with Rule 9(b) if the claims in fact sound in fraud").

## 2. Legal Standard Governing Plaintiffs' Section 10(b) and Rule 10b–5 Claims

Plaintiffs' first cause of action alleges violations of Section 10(b) of the Exchange Act and Rule 10b–5.[34] Rule 10b–5, promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b).

**27.** *Id.*, ¶¶ 6, 11, 141.

**28.** *Id.*, ¶ 6.

**29.** *Id.*, ¶¶ 123, 128.

**30.** MTD Opposition at 24.

**31.** Complaint, ¶¶ 199.

**32.** Although it is possible that certain allegations (e.g., failure to disclose related party transactions) might under certain circumstances plead innocent or negligent conduct due to lack of knowledge of the U.S. securities laws, the manner in which the allegations are framed in plaintiffs' complaint do not permit such an inference, as they plead intentional concealment.

**33.** See, e.g., Complaint, ¶¶ 123, 193.

**34.** Complaint, ¶¶ 176–184.

Specifically, one cannot "(a) . . . employ any device, scheme, or artifice to defraud; (b) . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

■ The elements of a section 10(b) or Rule 10b–5 violation are (1) the misrepresentation or omission of a material fact, (2) scienter, (3) reliance (4) in connection with the purchase or sale of a security, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); see also *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996) (en banc); *McCormick v. Fund American Companies, Inc.,* 26 F.3d 869, 875 (9th Cir.1994).

In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, which amended the Securities Exchange Act of 1934. In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b–5.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 320, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006)). The PSLRA's requirements "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explana-tion stating why the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1133 (9th Cir.2002)).

The PSLRA modified Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The statute requires, with respect to pleading that each allegedly misleading statement or omission was made with scienter, that plaintiff "state with particularity . . . facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A).

■ "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, . . . the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young,* 641 F.3d 1089, 1095 (9th Cir.2011) (citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991–92 (9th Cir.

2009)).[35]

■■■■ The Ninth Circuit has also emphasized that "plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.'" *Middlesex Retirement System v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1179 (C.D.Cal.2007) (quoting *Silicon Graphics*, 183 F.3d 970, 974 (9th Cir.1999)). The requisite state of mind must be a " 'departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Zucco*, 552 F.3d at 991 (quoting *Silicon Graphics*, 183 F.3d at 984). If plaintiffs rely on allegations of recklessness, the pleading standard requires that they "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979. Allegations of negligence are insufficient. *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 748 (9th Cir.2008) ("At most, it creates the inference that he *should have known* of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.*, No. 10–CV–03451–LHK, 2011 WL 3501733, *7 (N.D.Cal. Aug. 10, 2011) ("[T]he Ninth Circuit defines 'recklessness' as a highly unreasonable

**35.** In *Matrixx Initiatives, Inc. v. Siracusano*, —— U.S. ——, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011), relying on its earlier decision in *Tellabs*, the Supreme Court reviewed the facts concerning scienter collectively, rather than parsing individual allegations. See *id.* at ("In making this determination, the court must review 'all the allegations holistically,'" citing *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499); see also *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). *Zucco*, a post-*Tellabs* case, specifically noted the Supreme Court's instruction that courts view plaintiffs' allegations of scienter holistically, but stated that consideration of individual allegations of scienter was still pertinent when comparing whether the inference of knowledge or recklessness plaintiffs seek to draw is at least as compelling as the competing inference. See *Zucco*, 552 F.3d at 991–92 ("[W]e recognize that *Tellabs* calls into question a methodology that relies exclusively on a segmented analysis of scienter. We read *Tellabs* to mean that our prior, segmented approach is not sufficient to dismiss an allegation of scienter. Although we have continued to employ the old standards in determining whether a plaintiff's allegations of scienter are as cogent or as compelling as an opposing innocent inference, we must also view the allegations as a whole"). In *Matrixx*, the Supreme Court affirmed a Ninth Circuit decision that explicitly used the two-step approach in deciding that plaintiffs had successfully pled scienter. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir.2009) ("We must first 'determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter.' If not, we are to 'conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness,'" citing *Zucco*, 552 F.3d at 992). The Supreme Court did not disapprove or even mention the circuit court's test. It simply "conclude[d], in agreement with the Court of Appeals, that respondents ha[d] adequately pleaded scienter." *Matrixx*, 131 S.Ct. at 1324. Given that *Matrixx* relied on *Tellabs*, and given that the Ninth Circuit in *Zucco* adhered to the two-step analysis while acknowledging the *Tellabs* holding, the court concludes that it continues to adhere to its earlier methodology. See also *New Mexico State Investment Council*, 641 F.3d at 1095 ("Under *Tellabs* and Ninth Circuit law, we conduct a two-part inquiry for scienter: first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness").

omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it").

■■■■ "To qualify as 'strong' within the intendment of § 21D(b)(2) . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent.*" *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499 (2007) (emphasis added). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . . The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23, 127 S.Ct. 2499 (emphasis original). In determining whether plaintiffs have alleged facts that give rise to a strong inference of scienter, the court must draw all reasonable inferences from the allegations presented, including inferences unfavorable to plaintiffs. *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002). "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible[,]" [however]—it must be cogent and compelling . . . in light of other explanations.'" *Middlesex Retirement System,* 527 F.Supp.2d at 1179 (quoting *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499).

**B. Whether Plaintiffs Have Sufficiently Alleged the Sources of Their Information**

■■■■ China Integrated argues that plaintiffs' allegations rely heavily on information supplied by anonymous witnesses, and that they fail to plead corroborating details concerning the witnesses sufficient to demonstrate that they were in a position to know the information they have provided. In *Daou,* the Ninth Circuit outlined the information that must be provided concerning confidential witnesses. *In re Daou Systems, Inc.,* 411 F.3d at 1015. It stated:

"This circuit's approach does not necessarily require a plaintiff to name his or her confidential witnesses. However, this circuit does strictly adhere to the PSLRA's mandate that the complaint 'state with particularity all facts on which a belief is formed,' and in so doing, requires that a plaintiff reveal the sources of her information. . . . So long as plaintiffs reveal with particularity the sources of their information, the complaint will survive under the PSLRA. Naming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *Id.* at 1015.

See also *In re STEC Inc. Securities Litigation,* Nos. SACV 09–1304 JVS (MLGx), SACV 09–01306–JVS (MLGx), SACV 09–1320–JVS (MLGx), SACV 09–1460–JVS (MLGx), CV09–08536–JVS (MLGx), 2011 WL 4442822, *3 (C.D.Cal. Jan. 10, 2011) ("Allegations based on statements of confidential witnesses must describe the witnesses with sufficient particularity to establish their personal knowledge and reliability").

Plaintiffs counter that the sources of their allegations are not confidential because the complaint specifically identifies the analyst reports prepared by Alfred Little and Sinclair Upton.[36] As least as respects Sinclair Upton, the argument is somewhat misleading. While the complaint plainly sets forth the information plaintiffs obtained from the Sinclair Upton report, "Sinclair Upton" is a pseudonym.[37]

Reliance on a report published under a pseudonym raises somewhat different issues than those presented by reliance on a confidential informant. There is, for example, no concern that plaintiffs have fabricated a confidential witness to support their claims, since China Integrated can review Sinclair Upton's report and confirm that the allegations concerning its conduct quoted in the complaint were, in fact, made. While normally the identity of a confidential witness is known to plaintiffs, however, and they can make a determination regarding the witness's credibility before relying on his or her account, neither plaintiffs nor defendant are apparently aware of the identity of Sinclair Upton.

There is, moreover, no assurance that Sinclair Upton's identity can be ascertained through discovery, or that the author of the report can be deposed. For this reason, plaintiffs' suggestion that Sinclair Upton's report is analogous to one issued by Goldman Sachs is incorrect.[38]

Citing *In re China Education Alliance, Inc. Securities Litigation*, No. CV 10–9239 CAS (JCx), 2011 WL 4978483 (C.D.Cal. Oct. 11, 2011), plaintiffs argue that the added scrutiny of confidential witnesses mandated by *Daou* is not required in this case.[39] In *China Education Alliance*, the court concluded that a report issued by analyst firm Kerrisdale Capital did "not implicate the same skepticism as a 'traditional' anonymous source." *Id.* at *4. The court relied on *Henning v. Orient Paper, Inc.*, No. CV 10–5887–VBF (AJWx), 2011 WL 2909322 (C.D.Cal. July 20, 2011), which cited repeatedly to a report by an industry analyst known as "Muddy Waters." *Id.* at *2. The *China Education Alliance* court noted: "Although the authorship of the Muddy Waters report was not explicitly challenged by defendants,

---

**36.** MTD Opposition at 15–16.

**37.** See Declaration of Laura M. Vasey in Support of Defendant China Integrated Energy, Inc.'s Motion to Dismiss Plaintiff's Consolidated Complaint ("Vasey Decl."), Docket No. 75 (Feb. 22, 2012), Exh. B ("Sinclair Upton Report") at 1 (stating that "[d]ue to the danger of retaliation from the company, this report was written under a pseudonym, Sinclair Upton Research. People who commit fraud for tens of millions of dollars are willing to do anything to keep their illegitimate gains. The author of this report can be contacted at upton@husmail.com.").

In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). It may, however, consider documents that are incor-

porated by reference in, but not physically attached to, the complaint if they are central to plaintiff's claim, and no party questions their authenticity. See *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.2006) (in ruling on a motion to dismiss, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001). As the Sinclair Upton report is described at length in the complaint, and the source of many of plaintiffs' factual allegations, and as its authenticity has not been disputed by the parties, the court can consider it under the incorporation by reference doctrine.

**38.** MTD Opposition at 16.

**39.** *Id.* at 15–16.

the court implicitly and repeatedly attributed its findings to 'Muddy Waters,' and not any individual author." *China Education Alliance*, 2011 WL 4978483 at *4.

Neither the *China Education Alliance* nor *Henning* court expressly stated that the report on which it was relying was published under a pseudonym,[40] and neither analyzes the implications of that fact. To the extent *China Educational Alliance* can be read as holding that a report issued under a known pseudonym need not be viewed with added skepticism, the court disagrees. The plausibility of claims made by a source who is unknown to both plaintiffs and defendant is difficult to evaluate. More difficult still is evaluation of the author's ability to know the information being reported. As a result, the court concludes that, under *Daou*, the complaint must include information about the author of the Sinclair Upton report sufficient to demonstrate that he or she was in a position to know the information being provided. *In re Daou Systems, Inc.*, 411 F.3d at 1015.[41]

### a. Sinclair Upton

Plaintiffs do not provide extensive information about the manner in which Sinclair Upton purportedly came to know facts concerning China Integrated. They assert, for example:

"On March 16, 2011, analyst firm Sinclair Upton published a detailed, 44–page report (the 'Sinclair Upton Report'), on China Integrated exposing, *inter alia*, that: (i) China Integrated, through its main operating subsidiary Xi'an Baorun Industrial Development Co., Ltd. ('Xi'an Baorun Industrial'), reported significantly lower revenues, fixed assets and net income for 2008 and 2009 in its SAIC financial statements, as compared to the overstated amount claimed in the Company's 2009 Form 10–K filed with the SEC; and (ii) Defendants had been funneling money to corporations owned by Defendant Gao's son through the acquisitions of the Chongqing Tianrun factory and the Shenmu gas station." [42]

Although the complaint states that Upton Sinclair's allegations regarding China Integrated's SAIC filings were confirmed by Roth Capital Partners and plaintiffs' counsel,[43] it provides virtually no information about how Sinclair Upton came to his or her conclusions, or how Upton acquired the data on which the report was based. Were the court limited to the complaint alone, it would conclude that plaintiffs had failed adequately to allege the basis for Sinclair Upton's knowledge, and that allegations relying on the Sinclair Upton report could not be accepted as true.

China Integrated, however, asks the court to consider the Sinclair Upton report in analyzing its motion to dismiss.[44] As noted, the report can be considered under the incorporation by reference doctrine. See *Marder*, 450 F.3d at 448. As the name of the doctrine suggests, a document that is "incorporated" by reference is effectively added to the complaint, and treated as if it were part of the complaint.

---

**40.** In fact, an Internet search indicates that both Kerrisdale Capital and Muddy Waters Research are legitimate investment or research companies.

**41.** As the court explains *infra*, the Alfred Little report requires a somewhat different analysis, because China Integrated Energy has not provided any information that is a proper subject for judicial notice and that shows the name is merely a pseudonym.

**42.** Complaint, ¶ 10. See also *id.*, ¶ 130.

**43.** *Id.*, ¶¶ 11, 58, 109.

**44.** See Vasey Decl., ¶ 3.

*Straily v. UBS Financial Services, Inc.,* Civil Case No. 07–cv–00884–REB–KMT, 2008 WL 793615, *2 (D.Colo. Mar. 24, 2008) ("In essence, a document that is referred to in complaint and that is central to the plaintiff's claim becomes part of the complaint, even though the document is not attached to the complaint"). The court, therefore, can analyze the complaint and the Sinclair Upton report in tandem in determining whether sufficient information is provided about the bases for the report's conclusions.

The report provides far more information about the basis for the author's conclusions than does the complaint. It sets forth the sources on which its assertion that Gao Bo, the son of China Integrated Energy's CEO, was the majority shareholder in Chongqing Tianrun and Shenmu County gas stations, are based.[45] It similarly includes citations for its data suggesting that the Chongqing Tianrun biodiesel facility was not as profitable or large as China Integrated claimed.[46] the report's most significant allegation—that China Integrated's assets were overstated in its SEC filings—is similarly supported by numerous citations to documents the company filed with the Chinese and U.S. regulatory agencies.[47]

 As a result, although plaintiffs do not identify (and may not know) the identity of Sinclair Upton, the court concludes that the complaint, as supplemented by the Sinclair Upton report, sets forth with the facts on which they, and Sinclair Upton, rely—i.e., specified documents filed with Chinese and American regulators. *In re Daou Systems, Inc.,* 411 F.3d at 1015.[48] Consequently, in evaluating China Integrated's motion to dismiss, the court will accept as true plaintiffs' allegations based on the Sinclair Upton report.

### b. Alfred Little Report

China Integrated contends that "Alfred Little" is merely the pseudonym of a short seller.[49] It proffers no evidence that can be judicially noticed, however, establishing that "Alfred Little" is not the actual name of the author or company issuing the report. The report from Alfred Little, which China Integrated proffers with its motion, does not state that the name is a pseudonym,[50] and defendant adduces no other

---

**45.** Sinclair Upton Report at 7, 9 (attributing its charts concerning Gao Bo's majority share to "AIC filings of Chongqing Tianrun Energy Development Co., Ltd., Registration No. 500102000007340" and "AIC filings of Shenmu County Erlingtu Hongtu Oil Material Co., Ltd., Registration NO. 612722100000409")

**46.** *Id.* at 11–12 (citing SAIC filings).

**47.** *Id.* at 16–17 (citing SAIC and SEC filings).

**48.** Some of Sinclair Upton's assertions are not linked to a source whose basis for knowledge can be verified. (*Id.* at 7–8 (attributing information to a "third-party investigative firm report on Gao Bo.")) These citations support information that is not in dispute, however, such as the fact that Gao Bo is the son of China Integrated' CEO.

**49.** MTD at 1.

**50.** For the reasons described above, the report can be considered under the incorporation by reference doctrine. The report states: "Mr Little has over 35 years investing experience having begun his career as an accountant at Deloitte. He spent 10 years in China, from 1994 to 2004, representing various foreign investors including Coke, P & G, and Budweiser as they established beachheads in the world's fastest growing economy. Today he lives in New York and Shanghai and spends his time researching Chinese and other high growth companies. Having built a very successful track record investing the last decade, he now shares all his investing ideas in his financial blog 'Little Al's Big Emerging Market Picks.' Mr. Little is also a leading contributor in the China sector on Seeking Alpha." The report provides the web address for the blog, an email address, a link to Little's Linked In profile, and a Chinese tele-

evidence about the name or the author of the report.[51]

 Even were the court to treat Alfred Little as a confidential witness, moreover, it would conclude that plaintiffs have sufficiently allege the factual basis for the report's conclusions.[52] Plaintiffs allege in detail the process Alfred Little used to reach its conclusions. They assert that the falsity of China Integrated's reported net income was revealed when Alfred Little compared the income the company reported to American regulators with "a copy of Xi'an Baorun Industrial's 2009 Chinese audited financial statements purportedly audited by Zhongrui Yuenhua Certified Public Accountants, Shaanxi Branch, one of the largest Chinese audit firms in the PRC."[53] They plead the specific comparative figures that led Alfred Little to conclude that China Integrated was inflating its net income in its SEC filings.[54]

The complaint similarly includes detailed information concerning the process by which Alfred Little concluded that China Integrated had misrepresented production at its biodiesel factory in Tongchuan City. Plaintiffs allege that Alfred Little relied on "nearly continuous" surveillance of the facility conducted over a four month period by the International Financial Research and Analysis Group ("IFRA"), which was commissioned to undertake the investigation by one of its hedge fund clients.[55] Details of the investigation, which allegedly revealed no meaningful production at the facility, are provided in the complaint.[56] The complaint also identifies by last name the government official in Shaanxi who purportedly confirmed that, contrary to China Integrated's representations, the Tongchuan facility did not have a license to produce biodiesel fuel, and states that the official was contacted by IFRA investigators.[57]

Plaintiffs' allegations concerning China Integrated's Chongqing Tianrun production plant similarly detail the source of Alfred Little's information.[58] Specifically, plaintiffs assert that Alfred Little based its conclusions on three months of continuous surveillance by investigators, in which no tanker trucks were observed to enter or

---

phone number. (See Vasey Decl., Exh. C ("Alfred Little Report") at 12.) While it does appear to disclose that Little is a short seller (see *id.* ("Note: I am short CBEH"), nothing suggests that Little is a pseudonym).

51. *Id.*

52. MTD at 18–19.

53. Complaint, ¶ 63. The complaint provides a link to the Chinese audit report.

54. *Id.*, ¶ 59.

55. *Id.*, ¶ 84.

56. *Id.*, ¶ 87. The complaint states that "[a]ccording to the Alfred Little Report, IFRA investigators visited the Tongchuan factory in June and October 2010, and then conducted a four-month video surveillance commencing on November 26, 2010 through March 2011." (*Id.*, ¶ 85.) It also states: "The Alfred Little Report linked to 40 videos of the time-lapse video surveillance of the idle 100, 000–ton Tongchuan biodiesel factory showing no meaningful activity," and provides a link to the videos. (*Id.*, ¶ 86.) The complaint details the results of the surveillance: over the course of four months, investigators witnessed only six tanker trucks enter and leave the facility. Of these, five arrived the same day a group of investors toured the factory. (*Id.*, ¶¶ 87–88.)

57. *Id.*, ¶ 90. The complaint similarly provides information about the basis for plaintiffs' allegation that the company was not obtaining the quantities of biodiesel raw materials that were needed to run the facility. (*Id.*, ¶¶ 92, 94.)

58. *Id.*, ¶¶ 98–100.

leave the facility.[59]

China Integrated contends that this detailed information is insufficient, because the complaint does not provide information about "IFRA, the skill of their personnel, their reliability, or the authenticity of the video footage."[60] In fact, the complaint alleges that IFRA is "an 'independent provider of complex financial analysis, business research and investigative due diligence services'" and that "'[f]or more than 25 years, IFRA's principals have provided companies and individuals with the analysis and intelligence required to reduce their exposures in funding new business opportunities and investment.'"[61] It asserts that "IFRA 'often conduct[s] investigations in parts of the world where publicly available information is scarce or nonexistent, such as the People's Republic of China.'"[62] China Integrated also complains that Alfred Little did not detail when the cameras were running, that he published only excerpts of the video footage, and that he did not provide an "explanation of the time lapse involved, the placement of the camera, the identity of the vehicles, and the placement of the tank from which the trucks take delivery (among other things)."[63]

China Integrated cites no authority for the proposition that this level of detail must be alleged to satisfy Rule 9(b) and the PSLRA. In determining the amount of information required, *Daou* is instructive. There, the Ninth Circuit held that plaintiffs had provided sufficient information concerning the sources of their information, reasoning:

"Plaintiffs here describe the confidential witnesses with a large degree of specificity. Plaintiffs number each witness and describe his or her job description and responsibilities. In some instances, plaintiffs provide the witnesses' exact title and to which Daou executive the witness reported. For example, plaintiffs describe Confidential Witness # 6 as follows: 'Confidential Witness # 6 ("CW6") is a former Daou executive who worked in the Finance Department. CW6 dealt with audit issues, Security and Exchange ("SEC") reporting and budget matters. As such, CW6 was familiar with Daou's process of collecting project cost information. CW6 reported to defendant McGee.' Similarly, plaintiffs describe Confidential Witness # 9 as follows: 'Confidential Witness 9 ("CW9") is a former Daou Regional Vice President of Sales. As Vice President of Sales, CW9 was responsible for reporting weekly or bi-weekly sales information, such as sales status/backlog and forecast/pipeline information, to Daou's Vice Presidents and corporate officers.' Given the specificity of plaintiffs' descriptions of their confidential witnesses, we hold that plaintiffs have sufficiently met the PSLRA's requirements for confidential witnesses." *Daou*, 411 F.3d at 1016.

Plaintiffs provide an amount of information comparable to that which the Ninth

---

59. *Id.*, ¶¶ 98–99.

60. MTD at 19.

61. Complaint, ¶ 84.

62. *Id.*

63. *Id.* China Integrated essentially disputes the accuracy of the images captured on the videotapes and the accuracy of the conclusions Little and plaintiffs draw from them.

The court presently has before it a challenge to the sufficiency of plaintiffs' complaint. If the allegations of the complaint are sufficiently supported under the standard imposed by Rule 9(b) and the PSLRA, the fact that the allegations may later be shown to be false or incorrect does not change that fact or suggest that the case should not move beyond the pleadings stage.

Circuit found sufficient. The complaint alleges the extent of the surveillance and the results of Alfred Little's and IFRA's research. Plaintiffs do not merely provide a summary of the conclusions Alfred Little reached, but an explanation of how he reached those conclusions. They cite documents and videos on which his report was based. The court concludes, therefore, that plaintiffs have sufficiently met the requirements for pleading the bases on which confidential witnesses claim knowledge of relevant facts.[64] It thus turns to whether plaintiffs have sufficiently pled the elements of a Rule 10b–5 claim under the PSLRA's heightened pleading requirement.[65]

**64.** China Integrated Energy broadly suggests that allegations made by short sellers should be discounted as a matter of course. (MTD at 17, 20). It cites no authority, however, holding that "a complaint cannot establish the falsity of a company's SEC filings based upon the unsubstantiated and uncorroborated allegations of short sellers." (MTD at 2.) China Integrated's citation of *Katz* is unavailing, as the case neither addresses the reliability of short sellers nor the standard for evaluating confidential witnesses. See generally *Katz*, 2011 WL 6047093. China Integrated Energy also cites *Gary Redwen v. Sino Clean Energy, Inc.*, No. 11–CV–03936 PA (SSx) (C.D.Cal. Jan. 30, 2011), an unpublished decision from this district that it attaches to its motion. China Integrated contends that the *Gary Redwen* court dismissed "claims against China-based issuers for alleged violations of Sections 11 and 15 of the Securities Act where plaintiffs' allegations were based upon accusations by short sellers and alleged discrepancies between SEC and PRC regulatory filings." The decision, however, nowhere mentions short sellers. (MTD at 20, Vasey Decl., Exh. E.) It is not appropriate to judge the credibility of Alfred Little and Sinclair Upton at this stage of the litigation. Thus, that Alfred Little may have been a short seller of China Integrated stock, a fact that would potentially affect the credibility of his allegations, cannot be considered in deciding this motion. *In re China Educ. Alliance*, 2011 WL 4978483 at *4 ("The other key issue CEU raises is whether Kerrisdale had a motive to cause CEU's stock to decline as the impetus for issuing its report." That question, however, is "a factual dispute not appropriate for resolution at this stage,") citing *Henning*, 2011 WL 2909322 at *4 ("The truth of the Muddy Waters report and the audit committee's conclusions is a factual dispute not appropriate for resolution at this stage"); *In re LDK Solar Secs. Litig.*, 584 F.Supp.2d 1230, 1260 (N.D.Cal.2008) ("In the main, the mo-

tion is simply an attack on the credibility of their own management executive who has turned states' evidence and is the mainstay of the complaint. While exculpatory and inculpatory references must be considered at the pleading stage, the PLSRA in no way turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls. That is reserved for the jury").

**65.** At the hearing on the motion, China Integrated argued that the consolidated complaint unfairly allowed plaintiffs to skirt Rule 11, as its allegations rely on claims by short sellers and avoid factual assertions by plaintiffs that could subject to sanctions. Under Rule 11, by presenting a pleading to the court, an attorney asserts that to the best of his knowledge, formed "after an inquiry reasonable under the circumstances:"

"(1) [the complaint] is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information." FED.R.CIV.P. 11(b).

The court finds China Integrated's argument unconvincing. First, the court does not believe an attorney can escape Rule 11 sanctions by quoting information in a third party

### C. Whether Plaintiffs Have Adequately Pled Material Misrepresentations and/or Omissions

Plaintiffs' consolidated complaint alleges that (1) the 2009 10–K and the Registration Statement incorporating the 2009 10–K were materially false and misleading because China Integrated reported inflated sales revenue and net income, as demonstrated by the inconsistencies in its SEC and SAIC filings: (2) the 2009 and 2010 10–K statements and the quarterly reports filed with the SEC were materially false and misleading because China Integrated reported inflated biodiesel sales and production, and thus reported inflated revenues based on operation of the biodiesel plants; and (3) the November 2, 2010 Form 8–K, the third quarter 2010 10–Q and 2010 10–K were false and misleading because they concealed related party transactions involving China Integrated's CEO and his son. The court addresses the sufficiency of these allegations in turn.

#### 1. Discrepancies Between China Integrated Energy's SEC and SAIC Filings

Plaintiffs allege that China Integrated inflated its revenue and income in statements filed with the SEC, as demonstrated by lower figures reported to Chinese regulators.[66] They include in their complaint a chart that compares the figures contained in China Integrated's SAIC filings with those included in its 2009 10–K financial reports, and assert that a comparison of the numbers shows that the 10–K reports filed with American regulators materially overstated: "(a) the Company's sales revenue by $73.3 million (34 %); (b) costs of goods sold by $43.1 million (21%); (c) income from operations by $37.4 million (18,-786%), and net income by $37.7 million, (29,510 %)." [67]

Courts have found allegations of this type of discrepancy adequate to allege falsity. In *Dean v. China Agritech, Inc.*, No. CV 11–01331–RGK (PJWx), 2011 WL 5148598 (C.D.Cal. Oct. 27, 2011), the court analyzed allegations strikingly similar to those at issue here, including allegations that defendants concealed related-party transactions, had idle factories but reported significant revenue from those factories, and "had filed financial statements [with] the SEC for fiscal year 2009 that showed substantially larger net revenue . . . compared to Agritech's filings [with] the Chinese State Administration for Industry and Commerce ('SAIC')." *Id.* at *2. The court rejected defendant's contention "that inconsistencies between the Chinese and U.S. filings may be attributable to differ-

---

report but not specifically adopting it. Rule 11 requires that an attorney conduct an inquiry "reasonable under the circumstances" concerning the facts alleged in a complaint. An attorney who uncritically recites anonymous reports that lacks indicia of reliability cannot avoid the imposition of sanctions simply by leading that the allegations were made by someone else.

Additionally, China Integrated's argument is undermined by plaintiffs' allegations that their attorney independently verified the findings of the Alfred Little and Sinclair Upton reports. (See, e.g., Complaint, ¶¶ 58, 89, 91, 94, 100). Although plaintiffs cite the third party reports extensively, they have clearly adopted the allegations of the third parties as their own. (See, e.g., Complaint, ¶ 4 ("In truth, however, Defendants materially overstated the Company's revenue and net income in its SEC filings, thereby misleading investors as to the Company's true financial condition")). Rule 11 is as applicable to these plaintiffs as to any other. The fact that they rely on the Alfred Little and Sinclair Upton reports does not free them from the risk of sanctions, but also does not provide grounds for declining to accept their allegations of fact as true for purposes of resolving a motion to dismiss.

**66.** *Id.*, ¶¶ 4–5.

**67.** *Id.*, ¶ 59.

ences in accounting principles." It concluded that, "[a]ssuming as true the facts alleged in the [first amended complaint], the Court does not find it reasonable to infer that such large discrepancies in revenues are attributable only to differences in accounting principles." *Id.* at *5; see also *In re China Education Alliance*, 2011 WL 4978483 at *6 (concluding that falsity was adequately pled due to allegations that defendant "has filed significantly disparate revenue figures in China and the United States"); *Snellink v. Gulf Resources, Inc.*, 870 F.Supp.2d 930, 937, No. CV 11–03722–ODW (MRWx), 2012 WL 1693979, *5 (C.D.Cal. May 15, 2012) (same).

As China Integrated notes, some courts have held that a mere discrepancy between SEC and SAIC numbers is not sufficient to plead falsity under Rule 9(b) and the PSLRA.[68] According to the *Katz* court, such allegations are merely consistent with the SEC's numbers being false, and do not make plausible plaintiffs' claim that the numbers submitted to the SEC, as opposed to the numbers submitted to the SAIC numbers, were false. *Katz,* 2011 WL 6047093 at *4 (citing *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955). The court suggested that plaintiffs could have met their pleading burden, "for example, by pleading that Chinese and American accounting standards are sufficiently similar such that the SAIC and SEC numbers should be substantially the same, or that Defendants relied on the same underlying financial data in preparing the SEC and SAIC reports." *Id.;* see also *Gary Red-*

*wen,* No. 11–CV–03936 PA (Ssx) at *4–5 (discrepancies in the numbers provided to American and Chinese regulators are merely consistent with the conclusion that the SEC numbers are false, requiring that plaintiff "plead with greater specificity to make plausible the claim that the SEC numbers, not the [China's State Administration of Taxation] numbers, are false").

 Unlike in *Katz* and *Gary Redwen*, however, plaintiffs here allege a convincing explanation as to why the figures reported to Chinese regulators were correct, and the figures submitted to the SEC incorrect. They assert that China Integrated's Chinese filings are "presumably accurate" since a company submitting false information to Chinese regulators is subject to substantial fines and serious criminal penalties. In contrast, the assert, the SEC has "no ability" to enforce U.S. law against "defendants who are insulated and 'safe' in China."[69] Plaintiffs add that the discrepancy cannot plausibly be explained as an effort by China Integrated to avoid paying taxes on higher revenues in China, since the company claimed that Xi'an Baorun Industrial obtained an exemption from income taxes as an incentive for producing bio energy products.[70] Plaintiffs also allege that given their size, the "vast discrepancies" between the revenue and income China Integrated Energy's reported to the SEC and SAIC cannot be explained merely by differences in accounting principles.[71] Finally, the complaint reports discrepancies of enormous size in the revenue, costs of

---

68. MTD at 21–22.

69. *Id.,* ¶ 4; see also *id.,* ¶¶ 61–63.

70. *Id.,* ¶ 64. This allegation is undercut somewhat by plaintiffs' further allegation that the entity's SAIC income statements shows that it paid taxes in China. (*Id.;* see also *id.,* ¶ 65 (stating that Alfred Little reported that investigators contacted tax officials who con-

firmed that the entity was not exempt from paying income tax).) Plaintiffs contend, however, that multiplying the amounts reportedly paid by China's effective corporate income tax rate results in much lower income than was reported to the SEC. (*Id.,* ¶ 64.)

71. Complaint, ¶ 68.

goods, income from operations, and net income reported in the SEC and SAIC filings, in some cases as high as 29,510 %.[72] This renders more plausible plaintiffs' allegations that the figures reported to the SEC were false. *Dean,* 2011 WL 5148598 at *5 ("Assuming as true the facts alleged in the FAC, the Court does not find it reasonable to infer that such large discrepancies in revenues are attributable *only* to differences in accounting principles"); see also *Snellink,* 870 F.Supp.2d at 937, 2012 WL 1693979 at *5.

China Integrated argues that the discrepancies noted in the complaint do not make plaintiffs' allegations plausible, since the SEC financial disclosures concern China Integrated, while the numbers filed with Chinese regulators relate to Xi'an Baorun, a subsidiary of China Integrated.[73] *Gary Redwen,* No. 11–CV–03936 PA (SSx) at *5 (noting that discrepancies between the figures reported to American and Chinese regulators might be caused by the fact that the Chinese documents only reported figures for one of defendant's subsidiaries). Plaintiffs argue they have alleged that "Xian Baorun was China Integrated's only Chinese operating subsidiary, as stated in the Company's SEC filings," [74] and that China Integrated "operates its business in the [People's Republic of China] through certain contractual agreements between Redsky Industrial Co., Ltd. . . . . and Xi'an Baorun Industri-

al. Redsky Industrial is a wholly-owned subsidiary of China Integrated that is registered in the PRC." [75] Indeed, plaintiffs provide a diagram of China Integrated's corporate structure, which indicates that Xi'an Baorun Industrial is wholly controlled by Redsky, which is owned by Boarun Group, which in turn is owned by China · Integrated Energy.[76] The chart, which is allegedly derived from China Integrated's SEC filings, does not indicate that China Integrated has other subsidiaries or sources of revenue other than Xi'an Baorun in China.[77] Taking the facts alleged in the complaint as true, Xi'an Baorun is China Integrated's only operating subsidiary, as a consequence of which the revenue and income for Xi'an Baorun and China Integrated should be the same.

In sum, given the pleading of multiple reasons why the figures reported to the SAIC were presumably accurate—which allegations must, for purposes of this motion, be accepted as true—plaintiffs' allegations that China Integrated made misleading statements about its revenue and income in its disclosures to the SEC adequately plead falsity. See *Snellink,* 870 F.Supp.2d at 937, 2012 WL 1693979 at *5 ("Plaintiffs allege Gulf's revenues come exclusively from its two subsidiaries, SCHC and SYCI[;] thus, assuming SCHC and SYCI's SAIC and SAT filings are accurate, Gulf grossly overstated its financial position in its SEC filings").[78]

---

72. *Id.,* ¶ 59.

73. MTD at 21–22.

74. MTD Opposition at 13 (citing Complaint, ¶¶ 42–51).

75. Complaint, ¶ 43.

76. *Id.,* ¶ 46.

77. *Id.*

78. China Integrated argues that the resignations of Pillsbury, KPMG, and China Integrated directors, and NASDAQ's decision to delist *the company, do not support an inference that the company's SEC filings were false.* (MTD at 22–23.) While it is correct that resignations themselves are not indicative of falsity, the allegations concerning KPMG's resignation suggest that at least that firm had "doubts concerning management's representations to KPMG in connection with the 2010

### 2. Allegedly Inflated Biodiesel Revenue

Plaintiffs allege that China Integrated represented in its 10–K reports that its biodiesel production and sales division accounted for 19.3% of total reported sales in 2009 and 17.1% of reported sales in 2010.[79] The biodiesel was allegedly produced at the company's Tongchuan factory.[80] China Integrated also purportedly filed quarterly financial reports with the SEC for the first three quarters of 2010, which reflected millions of dollars in biodiesel sales and sales volume of 18,400 tons, 22,-500 tons, and 24,000 tons, respectively.[81] The company allegedly repeated the representation that the Tongchuan factory was operating at full capacity during an earnings call with analysts.[82]

■■■ As discussed in detail above, plaintiffs allege that a four-month, nearly continuous surveillance of the Tongchuan factory by IFRA revealed no meaningful production activity at the facility.[83] They assert that a lengthy investigation of Chongqing Tianrun, another biodiesel factory owned by China Integrated, similarly revealed no meaningful production activity.[84] While China Integrated challenges the credibility of the Alfred Little report, on which plaintiffs rely, it does not assert that the reported facts, accepted as true, lack the particularity required to allege falsity. Nor could it. Plaintiffs plead the statements made by defendant that were allegedly misleading in detail, the reasons why the statements were misleading, and the facts on which their belief is based. 15

U.S.C. § 78u–4(b)(1). They plead facts concerning the surveillance that was conducted, going into sufficient detail that they describe an occasion on which truck traffic to and from the facility coincided with a tour being taken by investors.[85] Accepted as true, these allegations directly contradict China Integrated's assurances that the facility was operating at full capacity, and that it was selling tens of thousands of tons of biodiesel each quarter. *See Latham v. Matthews,* 662 F.Supp.2d 441, 460 (D.S.C.2009) (finding allegations sufficient to plead falsity where "Signalife appears to be telling its investors on March 25, 2008, that it[ ] is currently shipping orders for its Fidelity 100 and has an established manufacturing line, [then] the following week, it appears to be telling investors that it has shipped no orders and has no production line"). Consequently, they suffice to plead falsity.

### 3. Concealment of Related Party Transactions

Plaintiffs next allege China Integrated made false and misleading omissions by failing to disclose related-party transactions involving the son of its CEO. The complaint alleges that, on November 2, 2010, China Integrated filed with the SEC a press release on Form 8–K signed by defendant Gao, announcing the purchase of (1) the Chongqing Tianrun Energy Development Company, a biodiesel production plant, for $16.5 million and the Shenmu gas station, a privately owned service gas station, for $9.2 million.[86] On November 5,

audit and evaluation of internal controls." (Complaint, ¶ 17.)

79. Complaint, ¶ 69.

80. *Id.*

81. *Id.,* ¶¶ 72–74.

82. *Id.,* ¶¶ 78–80.

83. *Id.,* ¶¶ 83–88.

84. *Id.,* ¶ 14.

85. *Id.,* ¶ 87.

86. *Id.,* ¶ 101.

2010, China Integrated allegedly filed its 3Q 10–Q, signed and certified by defendants Gao and Pu, which similarly disclosed the purchases of the Chongqing factory and Shenmu gas station.[87] Finally, the purchases were disclosed in the company's 2010 10–K, which was filed with the SEC.[88]

The complaint alleges that SAIC filings reflect that, Gao's son, Gao Bo, owned 52.5% of Chongqing Tianrun at the time it was acquired by China Integrated.[89] The SAIC filings allegedly show that Gao Bo was a majority shareholder of Chongqing Tianrun through March 12, 2011, months after the transaction with China Integrated was consummated.[90] "Plaintiffs assert that as majority shareholder, Gao Bo would have received $8.6 million of the $16.5 million paid by China Integrated for the biodiesel factory; nonetheless, but the company purportedly did not disclose this related party transaction."[91]

The complaint also pleads that, in a letter to shareholders responding to the Sinclair Upton report ("the rebuttal"),[92] China Integrated asserted that the factory "generated approximately $11.3 million and approximately $25.0 million in revenue for the years ended December 31, 2009 and December 31, 2010, respectively; and approximately $2.0 million and approximately $4.2 million of pre-tax income, respectively."[93] The complaint alleges these amounts are far higher than the revenue and pre-tax income reported to Chinese regulators, "further support[ing] that China Integrated, at the direction of Defendant Gao, sough to benefit his son, Gao Bo, by overpaying for Chongqing Tianrun in the undisclosed related-party transaction."[94]

Plaintiffs likewise assert that SAIC filings reflect that Gao Bo was the majority owner of the Shenmu County Erlintu Gongtu Oil Material Company,[95] and that he received $7.36 million of the $9.2 million paid by China Integrated for the gas station.[96] As with the Chongqing Tianrun facility, the complaint pleads that the company misrepresented Gao Bo's involvement in the transaction as essentially that of a nominee for Xi'an Baorun Industrial, and despite its representation that Gao Bo was to transfer the interest to Xi'an Baorun Industrial, as of December 2011, he was still listed as the legal representative of Shenmu.[97] Plaintiffs also contend, based on SAIC filings, that China Integrated misrepresented the gas station's revenue in the rebuttal.[98]

Courts have previously held that similar allegations concerning a failure to disclose related-party transactions are adequate to plead falsity. See *In re A–Power Energy Generation Systems Ltd. Securities Litigation*, No. MDL 11–2302–GW(CWx), 2012 WL 1983341, *8 (C.D.Cal. May 31, 2012) (reaching this conclusion but noting that plaintiffs might not have pled sufficiently the facts that caused them to believe the parties were related); *Snellink*, 870

**87.** *Id.,* ¶ 102.

**88.** *Id.,* ¶ 103.

**89.** *Id.,* ¶ 104.

**90.** *Id.,* ¶ 111.

**91.** *Id.,* ¶ 114.

**92.** See *id.,* ¶ 12.

**93.** *Id.,* ¶ 115.

**94.** *Id.,* ¶ 116.

**95.** *Id.,* ¶ 117.

**96.** *Id.,* ¶ 118.

**97.** *Id.,* ¶¶ 119–120.

**98.** *Id.,* ¶ 121.

F.Supp.2d at 939, 2012 WL 1693979 at *7 (concluding that falsity had been sufficiently pled with regard to related party transactions); see also *Dean,* 2011 WL 5148598 at *4 (stating that "allegations of related party transactions raise an inference that Chang may have been motivated to overstate revenue in order to benefit Shenzen Hongchou," and concluding that this sufficed to give rise to a strong inference of scienter). As was true of plaintiffs' allegations concerning China Integrated's biodiesel production, defendant's only argument regarding plaintiffs' contention that the failure to disclose the related party transactions was misleading is an attack on the credibility of the Sinclair Upton report.[99] It does not argue that the allegations, taken as true, fail adequately do plead falsity under the PSLRA.

In its summary of facts, however, China Integrated highlights its rebuttal, which, as noted, is described in the complaint. There, China Integrated stated that although Gao Bo previously owned shares in Chongqing Tianrun in order to safeguard the company's investment, he "exited ownership of Chongqing Tianrun in November 2009, prior to its acquisition by CBEH." It also asserted that "no amounts" were ever paid to Gao Bo in connection with the acquisitions.[100] China Integrated notes that the rebuttal explained the actual owners of Chongqing Tianrun at the time of the acquisition were other individuals who,

to reduce their tax liability, contributed their ownership interest to Chongqing Tianrun's parent, Chongqing Huaneng, prior to the acquisition.[101] Xi'an Baorun Industrial then acquired Chongqing Tianrun from Chongqing Huaneng.[102] As respects the Shenmu acquisition, China Integrated cites statements in the rebuttal that "that the presence of Gao Bo in the structure of the transaction did not result in Gao Bo retaining any economic benefit."[103]

In the complaint, plaintiffs acknowledge that these claims were made in the rebuttal, but allege facts suggesting that the assertions were untrue. Specifically, they cite SAIC filings that purportedly show Gao Bo was a shareholder in Chongqing Tainrun until March 2011, and that he resigned as a member of the board of the company that month as well.[104] Plaintiffs also allege, contrary to China Integrated's assertions in the rebuttal, that Gao Bo benefitted from being a majority shareholder of Chonqing Tainrun at the time of the acquisition, receiving $8.6 million of the $16.5 million paid for the entity.[105] Regarding the Shenmu gas station acquisition, plaintiffs allege that Gao Bo is still listed as the legal representative of the company, and assert that—as majority owner—Gao Bo would have received millions from the acquisition.[106] The court cannot determine which of these two competing views of the transaction is the correct one. Plaintiffs have alleged with par-

---

99. See MTD at 19–20. Although China Integrated asserts that Sinclair Upton did not say that Gao Bo profited from the transactions, in fact Upton states that "Gao received personal sale proceeds of over $15 million in cash, courtesy of CBEH shareholders." (Sinclair Upton report at 10.)

100. MTD at 8.

101. *Id.* (citing Vasey Decl., Exh. J ("China Integrated Rebuttal") at 3). The court can consider this document, which is quoted ex-

tensively in plaintiffs' complaint, under the incorporation by reference doctrine.

102. *Id.* (citing China Integrated Rebuttal at 3).

103. *Id.*

104. Complaint, ¶¶ 111–112, 114.

105. *Id.,* ¶ 114.

106. *Id.,* ¶¶ 117, 120.

ticularity the statements made by China Integrated, explained in detail why they were misleading, and stated the basis for their belief. Accepting plaintiffs' allegations as true—as the court must—they have adequately pled that China Integrated's failure to disclose Gao Bo's involvement in the transactions was misleading.

### D. Whether Plaintiffs Have Adequately Pled Scienter

 While neither party briefs the issue extensively, China Integrated argues that plaintiffs have not alleged facts supporting a strong inference of scienter.[107] " 'A corporate defendant's scienter is necessarily derived from its employees.' " *In re REMEC Inc. Securities Litigation*, 702 F.Supp.2d 1202, 1259 (S.D.Cal.2010) (quoting *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, 501 F.Supp.2d 452, 481 (S.D.N.Y.2006)). "A corporation cannot act without human agents, and therefore 'a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement.' " *In re Impac Mortg. Holdings, Inc. Securities Litigation*, 554 F.Supp.2d at 1101 (C.D.Cal.2008) (quoting *In re Apple Computer, Inc., Sec. Litig.*, 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002)). "[C]orporate scienter relies heavily on the awareness of the directors and officers, who—unlike the public relations or personnel departments—are necessarily aware of the requirements of SEC regulations and state law and of the 'danger of misleading buyers and sellers.' " *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir.1995); see also *In re VeriFone Holdings, Inc. Securities Litigation*, No. C 07–6140 MHP, 2011 WL 1045120, *9 (N.D.Cal. Mar. 22, 2011) ("In the Ninth Circuit, a corporation is deemed to have acted with scienter with regard to a public statement only if the director or officer who made the alleged misstatement acted with scienter"). To raise an inference of scienter as to a corporate defendant, therefore, a complaint generally must plead scienter as to the individual executives or directors of the entity. See *Glazer*, 549 F.3d at 743, 745.

In evaluating allegations of corporate scienter, the Ninth Circuit has been skeptical of complaints alleging that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir.2003) (quotation and emphasis omitted). abrogated by *Tellabs* on other grounds, as recognized in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir.2008). Recently, however, the Ninth Circuit recognized two exceptions to the general rule, and held that "bare allegations of falsely reported information [could be] probative under certain narrow conditions." *Zucco*, 552 F.3d at 1000. The first exception concerns general allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" that are coupled with "detailed and specific allegations about management's exposure to factual information within the company." *South Ferry LP, No. 2*, 542 F.3d at 785. The *South Ferry* court held that in combination, such allegations could give rise to a strong inference of scienter. To satisfy this standard, plaintiffs might include in their complaint specific details

---

**107.** MTD at 23–24.

about the defendants' access to and review of information within the company. *Id.;* see also *Daou,* 411 F.3d at 1022 ("[S]pecific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1231 (9th Cir.2004) (plaintiffs pled facts giving rise to a strong inference of scienter because, among other things, the CEO of the defendant company was quoted as saying: "All of our information is on one database. We know exactly how much we have sold in the last hour around the world," and this was a specific and detailed statement about defendants' actual knowledge).

The second exception "permits an inference of scienter to arise where the information that has allegedly been misrepresented is readily apparent to the defendant corporation's senior management. Where the defendants 'must have known' about the falsity of the information they were providing to the public because the falsity of the information was obvious from the operations of the company, the defendants' awareness of the information's falsity can be assumed." *Zucco,* 552 F.3d at 1001; *Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982, 989 (9th Cir.2008) ("Here ... plaintiffs alleged particular facts (the stop-work orders) that support the inference that the backlog statements were misleading when made. These facts were prominent enough that it would be absurd to suggest that top management was unaware of them" (citation and quotation marks omitted)).

Plaintiffs allege that "[d]efendants China Integrated, Gao, Pu, Li, and Goldman em-ployed devices, schemes and artifices to defraud, while in possession of material adverse non-public information...." [108] They contend that defendants

> "had actual knowledge of the misrepresentations and omissions of material facts set forth [in the complaint] or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing China Integrated's financial condition from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by the false and misleading statements during the Class Period, Defendants China Integrated, Gao, Pu, Li, and Goldman, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discovery whether those statements were false or misleading." [109]

As China Integrated notes, these allegations are conclusory, and do nothing to contribute to a strong inference of scienter.[110] Plaintiffs do not include specific allegations about what individual defendants knew or how they knew it. Nor do they allege facts concerning China Integrated's corporate structure and the involvement of corporate officers in its operations. Compare *Nursing Home Pension Fund,* 380 F.3d at 1231. Rather, they contend that China Integrated's statements were "so dramatically false that they would create a strong inference that at least some corporate officials knew of

**108.** Complaint, ¶ 179.

**109.** *Id.,* ¶ 180.

**110.** MTD at 24.

the falsity upon publication." *Glazer*, 549 F.3d at 744. The court must analyze whether that is so with regard to the three categories of misrepresentations or misleading omissions alleged in the complaint.

### 1. Discrepancies Between China Integrated's SEC and SAIC Filings

■■ The court has found that plaintiffs have alleged with sufficient particularity that China Integrated reported false revenue and income figures to the SEC, as demonstrated by the markedly lower figures reported to Chinese regulators. Courts have previously concluded that significant discrepancies between the numbers reported to different regulatory agencies gives rise to a strong inference of scienter. *Scott v. ZST Digital Networks, Inc.*, No. CV 11–03531 GAF (JCx), 2012 WL 538279, *8 (C.D.Cal. Feb. 14, 2012) (finding that a "marked disparity" between figures reported to SEC and SAIC regulators sufficed to plead a strong inference of scienter); *In re China Education Alliance*, 2011 WL 4978483 at *6 (finding that

allegations regarding significant disparities between revenue figures reported in China and in the United States gave rise to a strong inference of scienter). The court agrees with this proposition. China Integrated's sales revenue, as reported to the SEC, was allegedly 34% higher than the revenue it reported to the SAIC.[111] Its income from operations and net income were allegedly even more inflated, 18,787% and 29,510% respectively.[112] Accepting the facts alleged in the complaint as true, the company reported to the SEC that it had tens of millions of dollars in net income ($37,870,963) while reporting the SAIC that it had virtually no net income ($127,-900).[113] Even absent detailed allegations about the level of detailed knowledge corporate officers and directors had regarding China Integrated's finances, these discrepancies are so obvious that they give rise to a strong inference of corporate scienter.[114]

### 2. Allegedly Inflated Biodiesel Revenue

■■ The court has also concluded that plaintiffs have alleged with adequate par-

111. Complaint, ¶ 59.

112. *Id.*

113. *Id.*

114. *In re Century Aluminum Co. Securities Litigation*, 749 F.Supp.2d 964 (N.D.Cal.2010), on which China Integrated relies, is not to the contrary. (MTD at 24.) There, the court found allegations of scienter insufficient, noting that plaintiffs essentially alleged that "defendants must have known about the accounting error because the mistake involved a lot of money." *Id.* at 973. It reasoned:

"However, as the FAC alleges and Century's SEC filings show, the Restatement moved $929,480,000 from 'Cash Flows From Operating Activities' to 'Cash Flows From Financing Activities'; there was no effect on net change in cash, assets, liabilities, shareholders' equity, net income (or loss), cash at the opening of the period, or

on cash at the end of the period. Century disclosed all of the salient aspects of the transaction terminating the Hedges, and the termination of the Hedges was a one-time event. There are no allegations in the complaint to suggest that management had any factual basis for knowing that GAAP required that the one-time transaction should be classified under 'Cash Flows From Financing Activities' as 'Issuance of preferred stock' rather than netted against 'Due to affiliates' under 'Cash Flows From Operating Activities.'" *Id.*

As can be seen, the court's conclusion that scienter had not been adequately pled rested on the fact that, while the error involved a sizeable amount of money, it was technical in nature, and would not have been readily apparent to management. Here, in contrast, the discrepancies alleged did not result from a misunderstanding of accounting rules, and the differences between the SEC and SAIC filings were so dramatic that they would have been readily apparent.

ticularity that China Integrated inflated its reported biodiesel sales and production. The complaint provides detailed allegations concerning the inflation of these numbers, and concludes that China Integrated's purported biodiesel production was "a complete hoax." [115] Despite China Integrated's representations to the SEC that biodiesel represented nearly a fifth of its total sales, and that the Tongchuan factory was producing tens of thousands of tons of biodiesel a quarter,[116] plaintiffs allege the facility was not operating at all.[117] As plaintiffs note,[118] this is strikingly similar to a hypothetical posed by the Seventh Circuit in *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702 (7th Cir.2008). The court stated:

> "[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 710.

The court agrees that, even absent detailed allegations about the information communicated to officers and directors about the Tongchuan factory, allegations that a significant portion of the company's reported sales were based on biodiesel production at a non-functioning factory give rise to a strong inference of corporate scienter. It strains credulity to believe that China Integrated's directors and officers did not know that a factory that was purportedly so critical to the company's

business that it generated 20% of total company sales was not functioning. See *Dean,* 2011 WL 5148598 at *4 ("Here, the following facts suggest a strong inference of scienter. First, based on the LM Research investigation, which took place in early 2011, and corroborated by a later investigation by Plaintiffs' own investigators, Agritech's factories either sat idle with no production or operated substantially below capacity").

That inference is only strengthened by allegations that the facility's only significant activity occurred during a March 2011 tour by investors. The complaint states:

> "On March 9th investigators filmed CBEH employees busily cleaning and preparing the factory for the next day's investor tour. Early on the morning of March 10th, four large biodiesel tanker trucks arrived and parked at the factory. It seemed CBEH management had indeed planned a 'show' for investors that day. Prior to this date, the surveillance team had only witnessed one previous tanker truck enter the factory (on March 2nd). Rather than filling up with diodiesel as would be expected in a real business operation, the four tankers sat idle for 1 hour 20 minutes awaiting the arrival of the investors. At 9:45 am the Rodman & Renshaw investors arrived precisely on schedule and were greeted by CFO Albert Up and VP–IP Susan Zhou. The place immediately came alive with four 30–ton tanker trucks pretending to fill up with biodiesel while loud humming sounds came from the production line."

A fifth tanker truck arrived during the tour. As far as anyone in attendance

---

**115.** Complaint, ¶ 141.

**116.** *Id.,* ¶ 69.

**117.** *Id.,* ¶¶ 83–88.

**118.** MTD Opposition at 19.

could tell, the Tongchuan plant appeared to be busily operating at 100% of capacity, just as management had repeatedly publicly stated. After the one-hour tour, CFO Albert Pu handed out gift bags and the investors departed. Management then departed. The last tanker truck departed. Most of the employees departed. "The factory quickly went back to the same idle emptiness of the prior four months." [119] This allegation suggests that China Integrated was actively trying to conceal the lack of production at the facility, and that company executives were actively involved in the deception. The allegation indicates the fact that China Integrated knew its representations about its biodiesel production was false, and attempted to ensure that investors would not discover this fact by taking steps to make it appear that the facility was functioning at full capacity. This evidence of concealment is strongly indicative of scienter. *In re Connetics Corp. Securities Litigation,* No. C 07–02940 SI, 2008 WL 3842938, *15 (N.D.Cal. Aug. 14, 2008) (concluding that plaintiffs "ha[d] pled a strong inference of scienter" based on allegations concerning defendant's efforts to conceal his stock sales).

### 3. Concealment of Related Party Transactions

 Finally, the court has found that plaintiffs have alleged with particularity that China Integrated misleadingly concealed related party transactions that benefitted the son of the CEO, Gao Bo. The complaint is based on allegedly misleading disclosures concerning the acquisition of the Chongqing Tianrun factory and Shenmu gas station, signed and certified by China Integrated officers who included the CEO.[120] It is natural to conclude that an executive is aware of the business dealings of his own son, particularly when those dealings were with the executive's own company. The fact that the company's CEO signed statements concerning the transactions that omitted the information that his son stood to benefit from the transactions creates a strong inference that the CEO, and therefore the corporation, was aware the statements were misleading. Plaintiffs have therefore sufficiently pled facts that give rise to a strong inference of scienter.

### 4. Conclusion Regarding Scienter

 As the Ninth Circuit has noted, the falsity and scienter analyses can often be treated as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re New Century,* 588 F.Supp.2d 1206, 1227 (C.D.Cal.2008) (citing *In re Read–Rite Corp.,* 335 F.3d 843, 846 (9th Cir.2003), and *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001)). Here, the same facts that suffice to plead falsity give rise to a strong inference of scienter. "To qualify as 'strong' within the intendment of § 21D(b)(2) ... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent."* *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499 (2007) (emphasis added). Here, China Integrated offers no scenario under which the alleged facts would be suggestive of non-fraudulent intent. It contends merely that plaintiffs "rely on ambiguous conduct or stretch inferences beyond their natural range." [121] As pled, the conduct is hardly ambiguous and the inferences rather direct. In this case, the inference of scienter is at least as

---

**119.** Complaint, ¶ 88.

**120.** *Id.,* ¶ 101.

**121.** MTD at 24.

compelling as any inference that come be drawn of non-fraudulent intent. Consequently, scienter is adequately pled.

### E. Whether Plaintiffs' Section 11 Claim is Adequately Pled

Earlier, the court concluded that plaintiffs' section 11 claim had to satisfy Rule 9(b). Because the claim is based on factual allegations concerning the false and misleading nature of the 2009 10–K financial statements, and because, for the reasons detailed above, the court concludes that plaintiffs have met their burden of alleging that the 10–K contained fraudulent misrepresentations under Rule 9(b) and the PSLRA, the court concludes that they have adequately alleged a section 11 claim as well.

### III. CONCLUSION

For the reasons stated, plaintiffs have pled with particularity that China Integrated Energy's statements were false, and has stated with particularity facts giving rise to a strong inference that the company acted with scienter. Defendant's motion to dismiss plaintiffs' claims alleging violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 and § 11 of the Securities Act of 1933 is therefore denied.